IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:18cr111-WKW-SRW |
| | ) | |
| LITTLE JOE FOSTER | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on defendant Little Joe Foster's motion to suppress (Doc. 25), the government's response (Doc. 32), and supplemental briefing (Doc. 40). The court held an evidentiary hearing on the motion over the course of two days – May 29 and June 12, 2018. For the reasons discussed below, the motion to suppress is due to be denied.

## FACTS[1]

On August 25, 2017, members of the United States Marshal's Gulf Coast Regional Fugitive Task Force were assigned to serve an arrest warrant in Montgomery, Alabama on an individual named Frederick Bell. The task force is responsible for serving warrants for crimes of violence in the tri-county area, and Bell was wanted by the Montgomery Police Department (MPD) for assault first degree, shooting into an occupied building, and two counts of unlawful drug distribution. He was also on probation for distribution. The task force previously had received information that the defendant in this case, Little Joe Foster, was one of Bell's close associates. For this reason, officers obtained an address for Foster's

---

[1] Some facts not relevant to the court's recommendation have been omitted. Also, to the extent that testimony at the suppression hearing conflicted on some points, this statement of facts reflects the court's findings as to the credible facts before it.

wife, Kenyota Foster, at an apartment complex on Calmar Drive, believing that Bell might be found at that location, or that someone at the residence might have knowledge of his whereabouts.

Members of the task force traveled to Calmar Drive to see if they could locate Bell and began to set up surveillance in several law enforcement vehicles. Some of the officers went into the apartment complex to find Kenyota Foster's apartment and determine whether her car was present. They advised the rest of the team over the radio that Foster's car, a blue Dodge Charger, was parked at the apartment complex. While the team was still setting up surveillance, two black males and two black females exited the building where Foster's car was parked and got into Foster's Dodge Charger. Task force officer Kevin Rosamond testified at the suppression hearing that the officer who saw the individuals get into the Charger did not say he knew "for a fact" that Bell was among them; thus, Rosamond characterized the stop that followed as an investigative stop. However, task force officer Kevin Byrd, who also testified at the hearing, recalled that the task force officers were advised (or "relayed") that the driver of the Charger matched the description of Kenyota Foster, the front seat passenger matched the description of Little Joe Foster, and the passenger seated in the back behind the driver's side matched the description of Frederick Bell, based on photographs of these individuals. The officers were unable to identify the other passenger in the rear seat. The court finds Byrd's testimony credible.

The officers who observed these individuals getting into the car radioed to other task force members that the Dodge Charger had come out of the apartment complex and turned left into Gas Light Curve heading toward Calmar Drive. Officer Kevin Byrd was

positioned in that area in his Dodge Ram 1500 pickup truck, along with Rosamond. When Byrd saw the Charger, at around 9:00 a.m., he turned on his blue lights and siren and stopped it by pulling his vehicle in front of the Charger; his truck was facing the car, resting almost against the front bumper. At the same time, another officer pulled behind the Charger, and a third blocked the driver's side door with his vehicle. In all, there were ten or 12 officers at the scene.

Byrd came out of his vehicle on the driver's side with his weapon drawn, and pointed his handgun into the car with the tactical light turned on so he could see inside through the window tint. The officers ordered the passengers to place their hands on the ceiling of the car and, according to Byrd, everyone complied except Bell. Rosamond testified that Little Joe Foster also "didn't want to put his hands up at first. He was moving towards the floor"; however, Rosamond said later in his testimony, "I remember Foster complying. Maybe a little bit slow, but, you know, not trying to hide anything." Rosamond also said that Byrd was in the best position to see what Foster was doing. Again, the court finds Byrd's account credible.

Byrd saw Bell reach around the vehicle and then reach toward his waistband. Byrd continued to order Bell to put his hands up, and Bell "came out with a black object" resembling "blue steel" that Byrd believed to be a handgun. Byrd said, "I think he's got a gun," to the other officers, and continued telling Bell to put his hands up. Byrd saw Bell reach toward the back of the driver's seat – where, as Byrd later learned, there was a seat pocket – and then start "grabbing again around his body where he was sitting," until he came out "with a purple bag." Byrd saw Bell reach down and place the bag in the area of

the floorboard; thereafter, Bell complied with the order to put his hands on the ceiling of the car.

The task force officers proceeded to remove everyone from the vehicle for officer safety, based on their belief that there was a gun inside. Byrd opened the front passenger door where defendant Little Joe Foster was sitting, grabbed Foster by the wrist, and began to bring him out of the Charger. Foster said, "I have a gun, I have a gun." The officers placed Foster face down on the ground beside the car, handcuffed him for officer safety, rolled him over on his side, and patted him down for weapons. They found a loaded Taurus Millennium 9mm handgun in the right front pocket of Foster's shorts, which he was wearing underneath his pants. Byrd and Rosamond both believed that Foster was a convicted felon,[2] and Byrd, at least, considered Foster to be under arrest at this time for unlawful possession of the weapon.[3]

All the doors of the Charger were open, and the officers could smell a strong odor of "fresh" (that is, unburnt) marijuana emanating from the vehicle.[4]  Byrd testified that "no matter where you stood around that vehicle, you could smell it." Byrd walked around to

---

[2] Several questions from counsel intimated that Foster did not, in fact, have a felony conviction at the time, but no evidence concerning his convictions actually was offered at the hearing.

[3] Rosamond, whose testimony was not a model of clarity, indicated that defendant Foster was not under arrest at this time, but he was "in custody" – a distinction which escapes the court, but which is not significant for purposes of this recommendation.

[4] Byrd testified that he recognized the smell of marijuana based on his law enforcement training and 22 ½ years of experience with the MPD. Rosamond – who had been on the task force for five years, and was a patrol officer for the MPD for four years – also said that he had training and experience in the difference between burnt and unburnt marijuana, and noted that "we do run into quite a bit of it."

the open door on the rear driver's side, and observed the butt of a handgun in the back pocket of the driver's seat, where Bell had been sitting. Byrd also could see the purple bag – a Crown Royal bag, which he had often seen used before to store narcotics – on the floorboard. Byrd testified that "[i]t looked like he [Bell] was trying to maybe push it with his foot or something under the seat[.]" After the firearm and the bag were photographed in place by Rosamond, Byrd collected the firearm, which was a revolver; a second firearm which he discovered in the seat pocket under the first one; and the Crown Royal bag. Byrd opened the purple bag and found a "green leafy substance," which smelled like marijuana, wrapped in individual clear plastic bags.

Byrd then walked around to the passenger side where defendant Foster had been sitting. He could see a black rectangular box with one end resting on the passenger side floorboard and the other leaning against the seat. After the box was photographed in place by Rosamond, Byrd removed it and looked inside. He did this because the box was placed in such a way that "it would have been sitting in between Mr. Foster's legs," which Byrd considered unusual, and because officers "had already found drugs in the back seat, so it's very likely that there could be other drugs in that vehicle. And we can still smell marijuana, so there was an idea of – the amount of odor of marijuana, that there was more than just that little bag."[5] Rosamond also testified to his understanding that the box was opened

---

[5] Byrd similarly testified that after the Royal Crown bag was removed, "you could still smell a very strong odor of … marijuana. I mean it was very strong. … so there was obviously more than just that Crown Royal bag in there. So at this point, you're trying to figure out … where else could it be [?]." Rosamond also testified that there was a strong smell of marijuana on both the passenger's and driver's side.

because of the smell of marijuana, and also because of the gun found on Foster and the history of the person (that is, Bell) whom the officers were there to arrest.[6] The box contained what the officers believed to be marijuana, crack cocaine, powder cocaine, ecstasy pills, and hydrocodone pills, which were individually packaged in clear plastic bags.

By this time, all the passengers in the Charger had been handcuffed and secured for officer safety.[7] They were placed in law enforcement vehicles and transported to the MPD's special operations division, where the narcotics bureau was located. One of the task force officers drove the Dodge Charger there as well for further investigation, including a more thorough search,[8] a check for ownership, and possible seizure because of the drugs and weapons found.

Sometime before noon on the same day, at the MPD special operations division, officer Jeffrey Ioimo and Detective R. Jackson advised defendant Little Joe Foster of his

---

[6] Rosamond understood from a previous conversation with an MPD investigator that Foster had been involved with illegal narcotics.

[7] According to his testimony at the suppression hearing, Byrd believed that Kenyota Foster was arrested on two outstanding capias warrants at the scene, although he did not make the arrest. Rosamond, too, said that she was considered under arrest at the scene because of the capias warrants, but he later testified that she was not arrested on the scene. Foster testified that she was not arrested at the scene; she was merely transported to the MPD special operations division for questioning. Later, when she was at the special operations division, she was arrested on the two capias warrants. The court need not resolve these conflicting reports for purposes of this recommendation.

[8] Kenyota Foster later gave written consent to search the Charger at around 11:00 a.m. after being transported to the MPD special operations division.

*Miranda*[9] rights prior to conducting an interview. A contemporaneous audio recording reflects that Jackson read Foster the rights form and asked Foster, "You understand that?" Government Exhibit 4. Foster replied, in the affirmative, "Uh-huh." *Id*. Jackson signed the rights form under the first paragraph, indicating that this part of the form had been read to Foster. Government Exhibit 3. Jackson then read Foster the second paragraph, containing a waiver of rights, as follows: "I fully understand the foregoing statement [that is, the explanation of rights] and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone." Government Exhibit 4. Jackson asked Foster, "Is that a true statement," and Foster said, "Yes, sir." *Id.* Foster then signed the waiver, and Ioimo signed as a witness. Government Exhibit 3. Ioimo testified that Foster may have asked what was going to happen with Kenyota Foster, but said he could not recall specifically; however, the audio recording does not reflect any such query during the interview. Government Exhibit 4. Ioimo also testified that he did not believe that Kenyota Foster would have been charged with the narcotics, due to their location in the vehicle. In addition, he said that to his knowledge no threats or promises were made to Foster to persuade him to make a statement or waive his *Miranda* rights, and that Foster did not mention anything of that kind to him. During the interview, and after being *Mirandized*, Foster said that all of the items that were located in the front seat of the vehicle belonged to him, but not those found in the back seat.

---

[9] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Defendant Foster testified at the suppression hearing that, while he was on the scene of the traffic stop, and prior to the custodial interview, "one of the officer[s]"[10] told him, "[I]f you don't own up to it, everybody in the car [is] going to jail." Defendant said that he understood this to mean, "if I don't say this is mine, everybody [is] going to jail." Defendant testified that in response to this statement, he said "on the scene," "it['s] mine." When asked what "stuff was [his]," defendant said, "that they said was in the box." He testified that if he had not been told that "everybody [is] going to jail," he would not have made a statement indicating that the drugs were his during the custodial interview, and that the only reason he made the statement was to protect his wife.

At the suppression hearing, the government asked defendant Foster whether he had been read his rights prior to his giving a statement during the custodial interview. Foster affirmed that he had. The government then asked if he understood his rights, and defendant answered, "Not really." Foster also testified that he did not understand the court's warning that he had the right to remain silent prior to his taking the stand at the evidentiary hearing. When the government asked whether his testimony in court was voluntary, Foster said that it was not.

## DISCUSSION

Defendant moves to suppress the drugs found in the front seat of the car and the

---

[10] On questioning, Foster could not identify the speaker. He said that it was not someone who had testified at the suppression hearing, and he did not know his name and was unable to describe him. Foster said only that "[i]t was a white guy."

statement he made after he was arrested.[11] The court takes each of defendant's arguments in turn.

**The Stop**

As an initial matter, it is unclear from the briefing whether defendant asserts that the officers lacked reasonable suspicion or lacked probable cause to stop Kenyota Foster's vehicle. The government maintains that because the officers had a warrant for Bell's arrest, and they believed Bell was in the vehicle, there was probable cause to effect the stop. *See* Doc. 32 at 5. The court agrees.

A sister district court was confronted with this question in *United States v. Provens*, 2009 WL 10695199, *3 (N.D. Ala. 2009). That court explained:

> Little authority is required to support the conclusion that police may conduct a traffic stop for the purpose of executing an arrest warrant for someone in the car. See *United States v. Rosario*, 305 Fed. Appx. 882, 885 (3rd Cir. 2009) ("[T]he Government established probable cause to stop the vehicle to execute the ... arrest warrant."); *United States v. Helton*, 232 Fed. Appx. 747, 749 (10th Cir. 2007) (traffic stop was a reasonable investigative stop for purposes of executing an arrest warrant, even though passenger in car turned out not to be subject of warrant); *see also Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002) (no violation of the Fourth Amendment where mistaken identity led to arrest of wrong person under valid warrant)). At the very least, the admitted existence of the Marshall County arrest warrant provided the Scottsboro police with reasonable suspicion to make the traffic stop for investigative purposes. Indeed, given that Officer

---

[11] At the evidentiary hearing, defense counsel said that defendant moves to suppress "[t]he drugs that were found in the front seat of the car and potentially the drugs that were found in the back seat of the car with Frederick Bell." He added, " [The drugs that were found in the back seat were] what I guess started the search. So[,] any drugs that were found in the car. We're not trying to suppress any weapons … And then the subsequent statement of my client after being arrested." The government responded that it does not intend to offer as evidence drugs other than those found in what is referred to as the "black box" – *i.e.*, the drugs found in the front passenger seat. Defense counsel then said that defendant "does to some degree challenge [the drugs in the back seat," but later clarified that his challenge to that evidence is "in the context of a chain of events," and that he does not expect those drugs to be offered as evidence against defendant.

> Manning knew the defendant and knew his automobile, there was express authority under the warrant to make the stop, just as any arrest warrant expressly authorizes the seizure of the subject of the warrant. By definition, a valid arrest warrant is a finding of probable cause to arrest. Consequently, the initial traffic stop raises no constitutional issue.

*Id.*

In this case, as in *Provens,* an arrest warrant had been issued for an occupant of the car – passenger Bell.[12] Prior to the date in question, the task force officers had learned that Bell was closely associated with defendant. The officers obtained an address for defendant's wife, Kenyota Foster, at an apartment complex on Calmar Drive, believing that Bell might be found at that location, or that someone at the residence might have knowledge of his whereabouts.  During the officers' surveillance of the property, they observed four individuals getting in a Dodge Charger which they believed belonged to Kenyota Foster. The officers were advised that the driver of the Charger matched the description of Kenyota Foster, the front seat passenger matched the description of defendant, and the passenger seated in the back behind the driver's side matched the description of Bell, based on photographs of these individuals. Because the officers believed that Bell may be in the vehicle, they had express authority, pursuant to the arrest warrant, to make the traffic stop for the purpose of executing the warrant. *See id.* Alternatively, based on the same facts outlined above, the officers had "at the very least … reasonable suspicion to make the traffic stop for investigative purposes." *See id.* Thus, to

---

[12] Defendant does not contest that there was probable cause for the warrant to be issued.

the extent that defendant's motion challenges the legality of the stop, it is due to be denied. The court finds no constitutional violation here.

**The Detention**

Defendant argues that his detention amounted to an unlawful seizure because the officers lacked reasonable suspicion that he was engaged in wrongdoing.[13] The government does not specifically address this argument in its response to the motion to suppress, but in the "facts" section of that response maintains that "[p]ursuant to training and practice, [the task force officers] moved to secure all of the occupants." *See* Doc. 32 at 2. Consistent with this statement, the government elicited testimony during the evidentiary hearing that defendant was initially detained for the purpose of officer safety.

The court agrees with defendant that he was seized for the purpose of the Fourth Amendment when the officers stopped the car he was traveling in, ordered him to put his hands on the ceiling, grabbed him by the wrist, pulled him out of the vehicle, placed him face down on the ground, handcuffed him, rolled him over on his side, patted him down for weapons, and kept him secured until the conclusion of the encounter. *See United States v. Mendenhall*, 446 U.S. 544, 553-554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("a person is 'seized' ... when, by means of physical force or a show of authority, his freedom of movement is restrained. ... Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several

---

[13] In the motion to suppress, defendant frames the detention issue as follows: "Whether the [t]ask [f]orce [o]fficers … had reasonable suspicion under the Fourth Amendment to detain [defendant] and subsequently conduct an unlawful search of the vehicle … ."  *See* Doc. 25 at 3.

officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.); *West v. Davis*, 767 F.3d 1063, 1070 (11th Cir. 2014) ("'[t]he Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.'") (citation omitted).

However, not all seizures violate the Fourth Amendment. When a car has been lawfully stopped, the Fourth Amendment permits the detention of a passenger for the safety of the officers, even if the passenger is not suspected of any wrongdoing, pending completion of the stop. In *Hudson v. Hall*, 231 F.3d 1289 (11th Cir. 2000), the Eleventh Circuit explained:

> As the Supreme Court has recognized, a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing. *See Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *see also Michigan v. Summers,* 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981) ("The risk of harm to both the police and the occupants [of a home during a search] is minimized if the officers routinely exercise unquestioned command of the situation."). We expect that, in some circumstances, a police officer conducting a traffic stop may properly direct passengers—for example, if they refuse to permit the officer to search their persons for weapons—to walk a reasonable distance away from the officer.

*Id.* at 1297. More recently, the Eleventh Circuit reaffirmed this principle, citing *Maryland*:

> In *Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Supreme Court held that an officer may order a passenger out of a vehicle during a stop for a traffic infraction without violating the Fourth Amendment even if there is no articulable reasonable suspicion to detain the passenger. *Maryland,* 519 U.S. at 410, 117 S.Ct. at 884. The Court explained that passengers pose as great a danger to police officers as do drivers during traffic stops. *Id.,* 519 U.S. at 414, 117 S.Ct. at 886.

12

> The Court's approval, in *Maryland,* of "officer control of passengers in a traffic stop stems from the 'legitimate and weighty' need for officer safety." *United States v. Clark,* 337 F.3d 1282, 1286 (11th Cir. 2003) (quoting *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331, 333 (1977)). Further, the Court has stated that it is "reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardy his safety." *Brendlin v. California,* 551 U.S. 249, 258, 127 S.Ct. 2400, 2407, 168 L.Ed.2d 132 (2007) (holding that a passenger has standing to challenge a stop's constitutionality because the passenger is seized from the moment a car is stopped).

*United States v. Hollins*, 336 F. App'x 921, 922–23 (11th Cir. 2009).

The fact that the traffic stop here was initially for the purpose of executing an arrest warrant, rather than a so-called "*Terry*[14] stop" for a traffic infraction or similar, did not limit the officers' ability to control the scene by detaining the defendant. In *Michigan v. Summers*, 452 U.S. 692 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants on the premises while a proper search is conducted." *Id.* at 711. The Eleventh Circuit has not expressly determined whether the reasoning of *Summers* categorically applies to the execution of arrest warrants, in addition to search warrants. *See Gomez v. United States*, 601 Fed.Appx. 841, 847 (11th Cir. 2015) ("Whether the categorical detention exception recognized by *Summers* in a search warrant context applies with equal force to the execution of an arrest warrant is an open question in this Circuit."). However, the Court has noted that "[o]ther circuits have indicated that the *Summers*

---

[14] *See Terry v. Ohio*, 392 U.S. 1 (1968).

exception also applies in the context of the police executing arrest warrants." *Id.* at 847-48 (citing *United States v. Enslin*, 327 F.3d 788, 797 n. 32 (9th Cir. 2003) ("concluding that, '[a]lthough *Summers* involved a search pursuant to a search warrant rather than a consent search to execute an arrest warrant, much of the analysis remains applicable' and applying *Summers* in the arrest warrant context"); *Cherrington v. Skeeter*, 344 F.3d 631, 638 (6th Cir. 2003) ("stating in dictum that 'the police have the limited authority to briefly detain those on the scene, even wholly innocent bystanders, as they execute a search *or arrest warrant*'")) (emphasis added by Eleventh Circuit) (footnotes omitted). Further, the Eleventh Circuit has indicated that "this Court has already cited and applied *Summers* to some extent to analyze what a police officer may lawfully do at the scene vis-à-vis detaining and controlling an innocent passenger during a traffic stop of a vehicle or a bystander on the sidewalk watching a fight." *Gomez*, 601 Fed.Appx. at 847 (citing *Hudson v. Hall*, 231 F.3d 1289, 1292 (11th Cir. 2000) (passenger during a traffic stop); *United States v. Clark*, 337 F.3d 1282, 1283 (11th Cir. 2003) (bystander to a fight)). In those cases, the Court pointed out, it "has noted that, '[a]s the Supreme Court has recognized, a police officer performing his lawful duties may direct and control—to some extent—the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing.'" *Gomez*, 601 Fed.Appx. at 847 (citing *Hudson*, 231 F.3d at 1297 (citing, *inter alia, Summers*, 452 U.S. at 702–03, 101 S.Ct. 2587); and *Clark*, 337 F.3d at 1286–87 ("citing *Summers* and stating that the Supreme Court held that the risk of harm to officers is minimized when police officers exercise unquestioned command of the situation")) (footnote and internal marks omitted). Based on these cases, the Court in

*Gomez* decided that the officer involved there "lawfully and reasonably directed and controlled the movement of [the defendant] in conjunction with the safe and efficient execution of [an] arrest warrant," without "reach[ing] the issue of whether to adopt *Summers's* broad, categorical rule for all arrest-warrant cases," "decid[ing] only that, under the totality of the facts ..., [the officer] did not act unlawfully in detaining [the defendant]." *Gomez*, 601 Fed.Appx. at 849 (temporary detention of defendant outside his residence while police were executing an arrest warrant for his father at the residence was permissible, where defendant was in the immediate vicinity of the execution of the arrest warrant, and, prior to being detained, defendant engaged the officer verbally and unintentionally bumped into the officer).

Similarly, this court concludes that, under the totality of the facts in this case, Officer Byrd reasonably seized defendant and controlled his movement by directing him to place his hands on the ceiling and then grabbing him by the wrist and pulling him out of the vehicle, in order to minimize the risk of harm to the officers and facilitate the orderly service of the arrest warrant. The officers were performing their lawful duties – i.e., executing an arrest warrant – and defendant was in the automobile carrying Bell, for whom the warrant had been issued. *See Gomez*, 601 Fed.Appx. at 847 ("Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification.") (quoting *Bailey v. United States*, 568 U.S. 186, 201, 133 S.Ct. 1031, 185 L.Ed.2d 19 (2013)). Moreover, the warrant was for assault first

degree[15] – which is a crime of violence under Alabama law – shooting into an occupied building, and two counts of unlawful distribution. *See also United States v. Fields*, 178 Fed. Appx. 890, 893 (11th Cir. 2006)(quoting *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993))(recognizing that '[d]rug dealing is known to be extremely violent). Additionally, the officers were presented with a moveable vehicle and four passengers. The officers witnessed Bell's behaving in a way that suggested he had a firearm in the vehicle, and potentially, on his person. Finally, the officers smelled the strong odor of marijuana. *See Muehler v Mena*, 544 U.S. 93, 99 (2005)(citing the presence of drugs,

---

[15] *See* Ala. Code § 13A-6-20 (1975).

(a)  A person commits the crime of assault in the first degree if:

(1)  With intent to cause serious physical injury to another person, he or she causes serious physical injury to any person by means of a deadly weapon or a dangerous instrument; or

(2)  With intent to disfigure another person seriously and permanently, or to destroy, amputate, or disable permanently a member or organ of the body of another person, he or she causes such an injury to any person; or

(3)  Under circumstances manifesting extreme indifference to the value of human life, he or she recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person; or

(4)  In the course of and in furtherance of the commission or attempted commission of arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree, or any other felony clearly dangerous to human life, or of immediate flight therefrom, he or she causes a serious physical injury to another person; or

(5)  While driving under the influence of alcohol or a controlled substance or any combination thereof in violation of Section 32-5A-191 or 32-5A-191.3, he or she causes serious physical injury to the person of another with a vehicle or vessel.

(b)  Assault in the first degree is a Class B felony.

weapons, or multiple occupants as concerns that justify detaining in handcuffs an occupant of a residence being searched and stating, in the context of executing a search warrant, "[t]hough the safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable). *See also Maryland*, 519 U.S. at 414 (noting that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car.").Taking of all these factors into consideration, the officer's concern for their safety was valid. It was wholly reasonable for the officers to cause defendant to place his hands on the ceiling and exit the vehicle in a controlled and orderly manner that was safe for everyone involved, pending execution of the warrant. Thus, the court finds no Fourth Amendment violation in the initial detention of the defendant for officer safety during the execution of the arrest warrant.

The reasonableness of the remainder of the officers' actions in detaining defendant – *i.e.,* their placing defendant face down on the ground beside the car, handcuffing him, rolling him over on his side, patting him down for weapons, and then keeping him secured until the conclusion of the stop – are properly analyzed under a different theory. The court finds that once the officers opened defendant's door and began to pull him out of the vehicle, what commenced as a stop for the purpose of executing an arrest warrant evolved

– in a matter of seconds – into a *Terry* stop, because the officers acquired reasonable suspicion at that time that defendant was involved in criminal activity.[16]

Although defendant complied with all commands, Officer Byrd smelled a strong odor of unburnt marijuana upon opening defendant's door. Moreover, once Byrd got defendant out of the car, defendant volunteered that he had a firearm on his person.[17] The officers already knew of defendant's association with Bell, whom they believed to be involved in drug distribution, and who just previously had been seen attempting to conceal something in the vehicle.[18] Taken together, this collective information, and the reasonable inferences that could be drawn from it, gave officers the required minimal level of objective justification for an investigatory stop of the defendant under the totality of the

---

[16] In *Terry,* the Supreme Court held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity "may be afoot," even if the officer lacks probable cause. *See* 392 U.S. 1 at 30.

[17] While not on its own sufficient to justify detention in a concealed carry state, *see United States v. Ubiles*, 224 F.3d 213, 217–18 (3d Cir. 2000), *as amended* (Sept. 28, 2000), this fact is nevertheless not an inconsiderable factor in the totality of the circumstances.

[18] While association is not in and of itself suspicious, it can contribute to a finding that reasonable suspicion existed. *Cf. United States v. Bell*, 762 F.2d 495, 498–99 (6th Cir. 1985) ("[W]hile the fact of companionship did not of itself justify [a] frisk ..., it is not irrelevant to the mix that should be considered in determining whether the agent's actions were justified.") (citation and internal quotation marks omitted).

circumstances. These articulable facts support a reasonable suspicion that defendant was engaged in criminal wrongdoing – *i.e.*, possessing and/or selling drugs.[19, 20]

It is well settled within this Circuit that during a *Terry* stop, an officer may detain a suspect if there is a concern for officer safety, and handcuffs are permissible. *See e.g.* *United States v. Aldridge*, 719 F.2d 368 (11th Cir. 1983)("Investigative detentions involving suspects in vehicles are especially dangerous to police officers."); *United States v. Farmer*, 2008 WL 2397597 (M.D. Fla. 2008)("[C]uffing a suspect during a *Terry* stop

---

[19] The officers also had reasonable suspicion that defendant was actively committing the crime of being a felon in possession of a firearm. Byrd and Rosamond both believed that defendant was a felon; therefore, once defendant volunteered he had a gun, the officers had reasonable suspicion. The fact that they may have been mistaken in their belief does not negate the reasonableness of their suspicion. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)("An officer's mistake of fact may provide the objective basis for reasonable suspicion or probable cause under the Fourth Amendment because of the intensely fact-sensitive nature of reasonable suspicion and probable cause determinations.").

[20] *See Terry*, 392 U.S. at 21-22 (In assessing reasonable suspicion, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?") (citation and internal marks omitted); *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) ("[T]he issue is not whether the particular officer involved actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop.") (citation and internal marks omitted); *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) ("[W]hether reasonable suspicion existed at the time of the investigatory stop is a question of law to be determined ultimately by judges, not policemen. ... [T]he question ... is not whether a specific arresting officer ... actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.") (citation and internal marks omitted); *Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) ("it is for the court ... ultimately to resolve whether, under the facts available to the law enforcement officer, the legal standard for reasonable suspicion was met.") (citation and internal marks omitted). Under the totality of the circumstances discussed above, the court concludes that the facts available to the officers at the moment of the seizure warranted a person of reasonable caution in the belief that defendant's detention was appropriate, and that, given the circumstances, reasonable suspicion objectively existed to justify the investigatory stop.

is a reasonable action designed to provide for the safety of the officers in cases where the officers reasonably believe their safety is threatened.")(citing *Holcy v. Flagler County Sheriff*, 2007 WL 2669219 at *3)(M.D. Fla. 2007)(citing, in turn, *United States v. Hastamorir*, 881 F.2d 1551, 1556-1557 (11th Cir. 1989)(holding that handcuffing a person during a traffic stop is permissible when agents reasonably believe the person presents a risk to their safety); *United States v. Smith*, 2008 WL 746546, *3-4 (N.D. Ga. 2008)(finding that after stopping a car commandeered by a driver who had given chase, officers acted constitutionally when they, for officer safety purposes, removed passenger – who had acted "fidgety" – and handcuffed him before patting him down). In addition, as noted above, the Eleventh Circuit "ha[s] recognized that '[d]rug dealing is known to be extremely violent,'" *Fields*, 178 Fed. Appx. at 893 (quoting *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993)), and the Circuit considers the question of whether the detainee was reasonably suspected to be dealing drugs to be relevant to the inquiry concerning whether an officer had an articulable and objectively reasonable belief that the suspect was potentially dangerous such that handcuffs were warranted during the detention phase. *See Fields* at 894 (noting that drug dealing is known to be violent and holding that the officer's "action in handcuffing" a detainee suspected of drug trafficking "was reasonably necessary to preserve the status quo" and "reasonable in order to protect [the officer's] safety"). Thus, the officers' efforts to secure defendant during the course of the investigation, including their handcuffing him, did not violate the Fourth Amendment. As explained above with regard to the initial seizure, the officers had a reasonable concern for their safety given the

nature of the offense for which the warrant was issued, the mobility of the automobile, the number of occupants in the car, and the presence of firearms and drugs on the scene.[21]

**The Search[22]**

Defendant argues that the search was unlawful because officers had no search warrant and they lacked probable cause. *See* Doc. 25 at 5-7. The government responds that the odor of marijuana gave the officers probable cause to search the vehicle, *see* Doc. 32 at 8, and it also relies on the so-called "plain view" and "search incident to arrest" doctrines. *See id*. at 5-8. The court agrees that officers had probable cause to conduct the search of the vehicle.

"A warrantless search of an automobile is constitutional if (1) the automobile is readily mobile and (2) there is probable cause to believe that it contains contraband or evidence of a crime." *United States v. Smith*, 596 F. App'x. 804, 807 (11th Cir. 2015)(citing *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011)). "The first prong is satisfied if the car is operational[.]" *Id.* (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). In this case, it is undisputed that the vehicle was operational. "Regarding the second prong, probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Id.* (citing *Lanzon*, 639 F.3d at 1300). "Probable cause may arise when an officer, though training or experience, detects the smell of marijuana." *Id.* (citing *United States v. Tobin*,

---

[21] Defendant does not challenge the duration of his detention.

[22] Defendant does not challenge the constitutionality of the pat down search of his person prior to his being handcuffed. He challenges only the propriety of the vehicle search.

923 F.2d 1506, 1512)(11th Cir. 1991)(*en banc*); *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982)(noting that it is "clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.").

At the evidentiary hearing, Byrd testified that, based on his training and experience, he recognized the strong odor of fresh marijuana coming from inside the vehicle once the doors were opened. Byrd said that, "no matter where you stood around that vehicle, you could smell it." Because Byrd detected the odor of marijuana emanating from the vehicle, he had probable cause to conduct a warrantless search of the car. *See Lanzon*, 639 F.3d at 1300; *Tobin*, 923 F.2d at 1512; *Lueck*, 678 F.2d at 903. "As the Supreme Court has explained, 'If there is probable cause to believe a vehicle contains evidence of criminal activity, [the Court's case law] authorizes a search of any area of the vehicle in which the evidence might be found.'" *Smith*, 596 F. App'x at 807. (quoting *Arizona v. Gant*, 556 U.S. 332, 347)(2009)(brackets in original). This includes containers within the car. *See United States v. Smith*, 694 F. Supp. 2d 1242, 1253-54 (M.D. Ala. 2009)("[A]nother warrantless search exception is the automobile exception wherein officers can search any container within an operational car without a warrant as long as they have probable cause to believe the container holds evidence of a crime.")(citing *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005)(citing, in turn, *California v. Acevedo*, 500 U.S. 565, 579-80 (1991)) and *United States v. Watts*, 329 F.3d 1282, 1285 (11th Cir. 2003)). Because the recognizable smell of fresh marijuana gave the officers probable cause for the warrantless

search, the search of the vehicle, including the search into the "black box" on the floor in front of defendant's seat, was reasonable and did not violate the Fourth Amendment.[23]

**The Statement(s)**

In his motion to suppress, defendant argues that his confession should be suppressed because he "gave a statement under the threat that if he did not accept responsibility for the drugs[,] … his wife, Kenyota Foster[,] would also be charged with the drugs attained [sic] during the illegal search of the vehicle." *See* Doc. 25 at 3. The government responds that prior to his custodial interview, defendant waived his *Miranda* rights and contends that his confession during the interview was voluntary. The government further argues that Kenyota Foster *could* have been charged with a crime related to the drugs; thus, if an officer told defendant that she could be charged if defendant did not confess, that statement was true and cannot be considered coercive. *See* Doc. 32 at 8-9.

Against the advice of counsel, the defendant took the stand at the suppression hearing. Rather than testifying that Ioimo or Jackson threatened him in his custodial interview, defendant said that while he was on the scene – prior to his custodial interview – "one of the officer[s]," whom defendant could not describe at first, but later described only as "a white guy," told him, "[I]f you don't own up to it, everybody in the car [is] going to jail." Defendant said that he understood this to mean, "if I don't say this is mine,

---

[23] Given the court's determination that the odor of marijuana gave the officers probable cause to conduct the search, the court need not address the government's alternative bases for upholding the search. Thus, the court does not reach the issues raised in the defendant's oral argument regarding capias warrants, and the government's supplemental briefing regarding the same.

everybody [is] going to jail." Defendant testified that he then admitted to this unidentified officer that the drugs in the black box were his. He said that if he had not been told that "everybody [is] going to jail," he would not have made a statement indicating that the drugs were his during the custodial interview, and that the only reason he made the statement was to protect his wife.

In light of this testimony, defendant's argument seems to be that because he was threatened at the scene of the stop, his statements in the subsequent, post-*Miranda* interview were not voluntary.[24] However, taking into account the interests of the defendant, the inconsistencies in his testimony, and his demeanor on the stand, *see United States v. Ramirez-Chilel*, 289 F.3d 744, 749-50 (11th Cir. 2002), the court does not find defendant's testimony credible.

First, defendant could provide very few details about the alleged threat. He could not identify the officer whom he alleges threatened him; only when pressed by the government "to describe him" did he offer the minimal information that the officer was "a white guy." Defendant provided no other details about the officer or the circumstances surrounding the threat, simply stating that there was "a lot [going] on." The court finds it improbable that defendant would have such scant information about something so significant.

Additionally, defendant's statements in the recorded custodial interrogation conflict directly with his testimony on the stand. Ioimo and Jackson advised defendant Foster of

---

[24] Defendant does not move to suppress the statement he alleges he made on the scene, and there is no indication that the government intends to offer it.

his *Miranda* rights prior to conducting an interview. A contemporaneous audio recording reflects that Jackson read Foster the rights form and asked Foster, "You understand that?" and Foster replied, in the affirmative, "Uh-huh." Government Exhibit 4. Jackson signed the rights form under the first paragraph, indicating that this part of the form had been read to Foster, Government Exhibit 3, and then read Foster the second paragraph, containing a waiver of rights, as follows: "I fully understand the foregoing statement [that is, the explanation of rights] and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone." Government Exhibit 4. Jackson asked Foster, "Is that a true statement," and Foster said, "Yes, sir." *Id.*  In contrast, on the stand, Foster testified that he did not understand the rights that were read to him or what the officers were asking.

Defendant's statements in the hearing were also inconsistent. For instance, when he took the stand, he was asked by the court whether he understood his right to be silent. He appeared to understand the court's warning, and responded, "Yes, ma'am," without reservation. However, minutes later – and only after he testified that he did not understand the warning he received prior to his custodial interview – defendant testified that he had not understood the court's warning and that his testimony at the hearing was not voluntary.

The court is also doubtful that defendant's version of events is true in light of the audio recording of the custodial interview. In that interview, defendant demonstrated no reluctance to respond to the officers' inquiries, and no apparent confusion as to their meaning. He remained cooperative throughout the interview, and not only confessed, but

did so adamantly. Defendant also never inquired as to his wife's fate during the interview, despite his alleged concern that she be saved from prosecution by his confession, and his knowledge that his wife had been taken to the station in handcuffs.

Finally, the court finds that defendant's interests in the matter, although not alone determinative, would provide ample motivation for his giving untruthful testimony. Ultimately, taking all of these factors together, the court cannot credit defendant's testimony that he was threatened on the scene.

Because the court does not find defendant's testimony credible, it need not determine whether the alleged statement by the unidentified officer was so threatening or coercive as to render defendant's statement in the custodial interview involuntary. In the absence of circumstances showing otherwise, a defendant's waiver of *Miranda* rights is presumed to be voluntary." *United States v. Sagoes*, 389 F. App'x. 911, 914 (11th Cir. 2010) (citing *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1133-4; 1137). Courts "determine whether a statement was made voluntarily, and thus was 'the product of an essentially free and unconstrained choice,' by examining the totality of the circumstances." *Id.* at 914 (citing *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). Among the factors to consider are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* (citing *Hubbard* at 1253).

The court has reviewed the audio recording and found no evidence that defendant was threatened, coerced, unduly confined or restrained, or subjected to physical force. Nor was defendant offered any promises or inducements to confess during the interview. The

audio also demonstrates that the interviewing officer advised defendant of his *Miranda* rights early in the conversation and that the interview was conducted entirely in a conversational tone, without undue pressure or threats. Defendant's questioning occurred within a couple of hours of the initial stop. There is no indication from the audio recording that defendant had difficulty understanding the *Miranda* warning or the questions posed to him, or suffered from any deficit in intelligence that would have rendered the confession involuntary. In fact, defendant sounds fully engaged and willing to confess throughout the entire interview. The court finds no Fifth Amendment violation here. Therefore, the statements defendant made to Ioimo and Jackson after he was advised of his *Miranda* warnings are admissible.[25]

## CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. 25) be DENIED.  It is further

ORDERED that **on or before July 27, 2018**, the parties may file an objection to the Recommendation.  Any objection filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party filing the objection objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

---

[25] Defendant also seems to argue that the statements are the "fruit" of a Fourth Amendment violation. *See* Doc. 25 at 7-8. The court has determined that there was no Fourth Amendment violation; therefore, this argument fails.

Failure to file a written objection to the Magistrate Judge's findings and recommendations under 28 U.S.C. §636(b)(1) shall bar a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3-1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

Done, on this the 13th day of July, 2018.

/s/ Susan Russ Walker_____
Susan Russ Walker
United States Magistrate Judge